Opinion for the court filed by Chief Judge RADER.
Dissenting opinion filed by Circuit Judge MAYER.
RADER, Chief Judge.
Douglas Dynamics, LLC (Douglas) sued Buyers Products Co. (Buyers) for infringement of several patents related to snowplow mounting assemblies. The United States District Court for the Western District of Wisconsin granted summary judg *1339 ment of non-infringement of U.S. Patent No. Re. 35,700 ('700 Patent) in favor of Buyers. Douglas Dynamics, LLC v. Buyers Prods. Co., 747 F.Supp.2d 1063 (W.D.Wis.2010). Following a jury verdict that found U.S. Patent No. 5,353,530 ('530 Patent) and U.S. Patent No. 6,944,978 ('978 Patent) valid and infringed, the district court denied Douglas a permanent injunction and assigned an ongoing royalty. Because the district court applied an erroneous claim construction in granting summary judgment of non-infringement of claim 45 of the '700 Patent, this court reverses. This court also reverses the denial of a permanent injunction against continued infringement of the '978 Patent, and remands for entry of a permanent injunction consistent with this opinion. This court also vacates the district court’s ongoing royalty rate for the '530 Patent and the '978 Patent, and remands to establish a new pre-injunction ongoing royalty rate consistent with this opinion. Because the '530 patent has expired, any permanent injunction as to this patent is now moot, and the ongoing royalty ceases to apply after the date of expiration.
I.
Douglas and Buyers both manufacture snowplow assemblies for mounting on the front of a truck. These companies compete against one another for sales of those assemblies. Douglas commands about sixty percent of the snowplow market and “is recognized as producing good quality, innovative snowplows.” J.A. 5. Buyers entered the market in 2007, selling less expensive snowplow assemblies, which Douglas accuses of infringement. By 2010, Buyers had increased its market share to about 5%.
Douglas’s '700 Patent claims a snowplow assembly that can be conveniently mounted on a vehicle and removed as a single unit. The patented features allow the user to remove heavy portions of the snowplow assembly from the front of the vehicle when the plow is not in use, thus reducing stress on the vehicle’s suspension. Additionally, the inventive mounting frame does not extend beyond the vehicle’s bumper upon removal of the snowplow assembly. This feature reduces the likelihood the mounting frame will inadvertently cause damage because it protrudes beyond the front bumper. Prior art removable assemblies either left a lifting mechanism protruding from the front of the vehicle, required numerous disassembly steps, or required storage in separate parts that could be lost or damaged.
Figure 1 of the '700 Patent depicts a preferred embodiment of the assembly in which the snowplow blade (20) is fixed to an A-frame (22). The A-frame connects to a lift frame (24) via a chain (144) and a mounting plate (76). On the right-hand side of the figure is the mounting frame (16), which can be attached behind the front bumper of a truck. Figure 1 depicts the assembly in the unmounted position, in which the assembly is detached from the mounting frame.
*1340 [[Image here]]
Douglas asserted independent claims 1, 38, and 45 of the '700 Patent against Buyers’s SnowDogg Snowplows.
Claim 1 recites:
1. A vehicle mounted snowplow blade assembly comprising a vehicle having a frame member and a bumper,
a mounting frame fixed to the frame member and located generally behind the bumper,
a snowplow blade assembly including an A-frame and a snowplow blade fixed to the A-frame,
a lift frame supported by the A-frame, and
mounting means for selectively connecting the A-frame to the mounting frame for pivotable movement about a generally horizontally extending pivot axis and for affording removal of the A-frame and the lift frame from the mounting frame as a unit so as to leave the mounting frame on the vehicle and behind the bumper.
'700 Patent col. 13 11. 27-42 (emphases added). Independent claim 38 is essentially the same as claim 1.
The district court held that the limitation “a lift frame supported by the A-frame” of claims 1 and 38 requires the A-frame to support the lift frame “in both the mounted and unmounted states.” Douglas Dynamics, 747 F.Supp.2d at 1088. Because Buyers’s snowplow assemblies have the lift frame supporting the A-frame—the opposite of the claimed configuration—the district court granted summary judgment of noninfringement. Id.
Unlike claims 1 and 38, claim 45 of the '700 Patent does not require that the lift frame (also referred to as a “support frame”) be supported by the A-frame. Claim 45 recites:
45. A vehicle mounted snowplow blade assembly comprising
*1341 a vehicle having a frame member and a bumper,
a mounting frame fixed to the frame member and located generally behind the bumper,
a snowplow blade assembly including an A-frame and a snowplow blade fixed to the A-frame,
a support frame connected to the A-frame, and
wherein the A-frame and the support frame are connected to the mounting frame for pivotable movement of the A-frame about a generally horizontally extending pivot axis and for affording removal of the A-frame and the support frame from the mounting frame as a unit so as to leave the mounting frame on the vehicle and behind the bumper.
'700 Patent col. 18 11. 42-57 (emphases added).
The district court construed the limitation “wherein the A-frame and the support frame are connected to the mounting frame” to require that the A-frame and the support frame each be directly connected to the mounting frame. Specifically, the court held that “the invention described in claim 45 requires that the A-frame and the mounting frame each have structures directly attached to them in some manner, such as through welding, that serve as connection points between the two frames.” Douglas Dynamics, 747 F.Supp.2d at 1093.
In Buyers’s accused products, the A-frame connects to the support frame, which in turn connects to the mounting frame. Id. at 1092. The figure below shows Buyers’s snowplow assembly, illustrating the indirect connection between the A-frame (pink) and the mounting frame (green) via the support frame (blue).
[[Image here]]
Claim construction is a matter of law which this court reviews without deference. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed.Cir.1998) (en banc). “This court reviews the district court’s grant or denial of summary judgSerdarevic v. Advanced Med. Optics, Inc., 532 F.3d 1352, 1362 (Fed.Cir.2008). In this case, the law of the United States Court of Appeals for the Seventh Circuit draws all reasonable inferences in favor of the non-movant in summary judgment *1342 cases and determines whether the district court correctly concluded that no reasonable jury could find in favor of the moving party. See Stoner v. Wisconsin Dep’t of Agric., Trade & Consumer Prot., 50 F.3d 481, 484 (7th Cir.1995).
This court finds no error in the district court’s construction of claims 1 and 38 as requiring the A-frame to support the lift frame in both the mounted and unmounted states. As the district court noted, claim 9, which depends from claim 1, specifically refers to a state “when the A-frame is not connected to the mounting frame.” '700 Patent col. 14 11. 11-14. The inventors surely knew ways to recite a limitation that applies only to one state or the other, and the selective reference to the unmounted state in dependent claim 9 implies that claim 1 encompasses both states. Because claims 1 and 38 require the A-frame to support the lift frame in both the unmounted and mounted positions, the district court correctly granted summary judgment of noninfringement to Buyers’s snowplows.
The district court erred, however, in construing the term “connected to” in claim 45 to require a direct connection between the A-frame and the mounting frame. The plain language of the claim counsels against this narrow interpretation. “[T]he words of a claim ‘are generally given their ordinary and customary meaning’ ... that the term would have to a person of ordinary skill in the art in question at the time of the invention.” Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed.Cir.2005) (en banc) (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed.Cir.1996)). “[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which [it] appears, but in the context of the entire patent, including the specification.” Id. at 1313. While claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims. Id. at 1323.
The ordinary meaning of “connected to” encompasses indirect linkages. Indeed, the specification uses variations of the term “connect” to describe indirect connections. For example, the specification states that the snowplow blade “is connectable to the mounting frame ... through an A-frame.” '700 Patent col. 4 11. 49-57 (emphasis added); see also col. 10 11. 61-64 (explaining the lift arm moves the A-frame and snowplow blade by way of a “chain connection”). The '700 Patent does not at any point limit the connection between the A-frame and mounting frame to a “direct” connection.
The district court erred by reading claim 45 narrowly to encompass only those connections between the A-frame and the mounting frame specifically described in the specification. Douglas Dynamics, 747 F.Supp.2d at 1093; see also id. at 1089-91. The court recognized that the customary meaning of the claim language encompassed indirect connections. Indeed, the trial court opined that “in a very general sense the A-frame is ‘connected’ to the mounting frame” in Buyers’ SnowDogg snowplow assemblies. Id. at 1091. Nonetheless, because the specification does not depict the A-frame connected to the mounting frame only by way of the lift frame, and does not explicitly state that the lift frame can be viewed as connecting the A-frame to the mounting frame, the district court found such a configuration outside the scope of the claims. Id. at 1089.
To the contrary, the district court’s construction would exclude a preferred embodiment of the invention. Douglas Dynamics, 747 F.Supp.2d at 1089. Figure 6 depicts the lift frame connected to the *1343 mounting frame not “directly,” but via an intermediate removable hitch arm. '700 Patent Fig. 6 & col. 6 11. 48-64. As shown in Figure 7, this L-shaped hitch arm is separate from both the mounting frame and the lift frame, but serves to indirectly connect the two frames together. Id. Fig. 7.
Buyers and the district court suggest that construing claim 45 to encompass connection of the A-frame to the mounting frame via the support frame renders superfluous a limitation requiring the A-frame to be connected to the mounting frame. Specifically, claim 45 recites, “a support frame connected to the A-frame, and wherein the A-frame and the support frame are connected to the mounting frame ...” Id. col. 18 11. 50-52 (emphasis added). Because claim 45 already requires connection between the support frame and the A-frame, the district court found it would be redundant to state that both the “A-frame and the support frame are connected to the mounting frame” unless separate, direct connections were intended. Id. (emphasis added); see Douglas Dynamics, 747 F.Supp.2d at 1098. The court reasoned that simply reciting a connection between the support frame and the mounting frame would necessarily imply an indirect connection between the A-frame and the mounting frame. See Douglas Dynamics, 747 F.Supp.2d at 1093.
This court does not view the language as superfluous. Rather, claim 45 requires the A-frame and support frame' unit to connect to the mounting frame. This arrangement allows “pivotable movement of the A-frame about a generally horizontal extending pivot axis.” This array also permits “removal of the A-frame and the support frame as a unit.” '700 Patent col. 18 11. 52-55. Claim 45 thus recites functional requirements for the connection between the mounting frame and the A-frame/support frame unit. These requirements can be met by connecting either the A-frame or the support frame, or both, to the mounting frame in the appropriate manner.
In sum, the correct construction of the term “connected to” in claim 45 is not limited to direct connections. The record shows that Buyers’s SnowDogg snowplow assemblies include an A-frame connected to a support frame with the support frame then connected to a mounting frame. See Douglas Dynamics, 747 F.Supp.2d. at 1092. Buyers has not presented any other arguments against infringement of claim 45. Accordingly, this court finds the accused products meet every limitation of claim 45 as properly construed. Therefore, this court reverses, the grant of summary judgment of noninfringement and directs the district court to enter summary judgment of infringement in favor of Douglas.
III.
The district court denied Douglas’s request for a permanent injunction against infringement of the '580 and '978 Patents, even though both patents were found infringed and not invalid after summary judgment motions and a jury trial. On appeal, Buyers concedes validity and infringement of those patents but contends the district court properly denied a permanent injunction because Buyers does not “directly compete” with Douglas and because the '530 and '978 Patents cover only some components of the accused snowplow assemblies.
While this case was on appeal, the '530 Patent expired. Therefore, an injunction on the technology covered by that patent is moot. The '978 Patent on the other hand remains in force, and for the following reasons, this court reverses the denial of an injunction as to that patent.
*1344 This court reviews the denial of a permanent injunction for an abuse of discretion. i4i Ltd. P’ship v. Microsoft Corp., 598 F.3d 831, 861 (Fed.Cir.2010). To be entitled to a permanent injunction, a patentee must show: (1) it has suffered an irreparable injury; (2) remedies available at law are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. Id. (citing eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)).
Here, the district court concluded that “Douglas has failed to make even a threshold showing of irreparable harm.” Douglas Dynamics, LLC v. Buyers Prods Co., (Denial of Permanent Injunction Order), No. 09-CV-261 (W.D.Wis. Feb. 25, 2011). Although “the parties here compete for sales of snowplow truck assemblies, along with a number of other manufacturers,” the district court found that Douglas suffered no injury because Douglas failed to show it was losing sales or market share to Buyers. The district court relied on evidence that persons willing to pay for a Douglas snowplow were unlikely to purchase a Buyers snowplow as a substitute, and that Douglas’s market share increased about 1% a year after Buyers introduced its infringing snowplows.
Simply because a patentee manages to maintain a profit in the face of infringing competition does not automatically rebut a case for irreparable injury. Irreparable injury encompasses different types of losses that are often difficult to quantify, including lost sales and erosion in reputation and brand distinction. Here, the district court likened Douglas’s snowplow to a Mercedes Benz S550 and Buyers’s snowplow to a Ford Taurus. Id. Indeed, buyers interested in purchasing the Mercedes, when presented with both choices, would not likely switch to the Ford and vice versa. However, if the Ford made its place in the market by infringing on the intellectual property of the Mercedes and capitalized on its similarity to the better product, then the harm to the Mercedes product might go beyond a simple counting of lost sales—some of which would occur anyway if the Ford marketed itself effectively as a “Mercedes at half the price.” The Mercedes would lose some of its distinctiveness and market lure because competitors could contend that they had “similar features” without noting that those features infringe Mercedes’s proprietary technologies.
Furthermore, the fact that Douglas’s market share increased 1% a year after Buyers introduced its infringing snowplow is, at least in this case, immaterial. The record shows that Douglas dedicates significant amounts of time and money towards marketing and sales, engineering, and research and development. Over the years, it has earned itself a reputation in the marketplace as an innovator and trusted supplier of quality snowplows. Stated differently, even with a Ford Taurus announcing that it possessed similar features on the market, Mercedes could maintain or increase its market share for a variety of reasons.
The district court also made a clear error of judgment in its analysis of Douglas’s reputation loss. The district court found that Douglas had a reputation as an innovator, yet determined there was no injury because there was no evidence that interested consumers confused the two companies. Even absent consumer confusion, however, there can still be harm to a company’s reputation, particularly its perception in the marketplace by customers, dealers, and distributors. As just one example, Douglas’s reputation as an inno *1345 vator will certainly be damaged if customers found the same “innovations” appearing in competitors’ snowplows, particularly products considered less prestigious and innovative. Furthermore, as Buyers’s expert agreed, Douglas’s reputation would be damaged if its dealers and distributors believed it did not enforce its intellectual property rights. Lastly, the evidence shows that Douglas had never licensed the infringed patents, and intentionally chose not to, so that it could maintain market exclusivity. Exclusivity .is closely related to the fundamental nature of patents as property rights. It is an intangible asset that is part of a company’s reputation, and here, Douglas’s exclusive right to make, use, and sell the patented inventions is under attack by Buyers’s infringement.
Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions. The evidence submitted by Douglas leads this court to conclude Douglas has suffered irreparable injury from Buyers’s infringement.
in regard to the remaining equitable factors, this court concludes that, on balance, they also favor entry of a permanent injunction.
This court finds remedies at law inadequate to compensate Douglas for at least the reputation loss Douglas has suffered from Buyers’s infringement. Furthermore, this court again disagrees with the district court that Douglas should suffer some penalty for managing through great effort to maintain market share in the face of infringing competition. More relevant is the rise in Buyers’s market share from zero to about 5% in three years while infringing Douglas’s patents. This record evidence underscores the profitability of infringement and suggests that mere damages will not compensate for a competitor’s increasing share of the market, a market which Douglas competes in, and a market that Douglas has in part created with its investment in patented technology. Lastly, the district court clearly erred in continuing to characterize the '530 and '978 Patents as “minor” even though the '530 Patent is Douglas’s only patent that covers the embodiment of the attachment/detachment technology used by Buyers and by Douglas’s own Minute Mount products. In fact, the record shows that Buyers’s initial attempts to design-around the '530 Patent failed. J.A. 8.
In balancing the hardships between the parties, the district court concluded that “at best, [it was] a wash for Douglas” because Douglas did not lose sales or market share while Buyers would only have to “junk its unsold stock of infringing snowplow assemblies” and design around the patents. J.A. 9-10. In this connection, Buyers represented to the district court that its new design around was ready for implementation. J.A. .8. Having concluded that Douglas has suffered irreparable injury, the district court clearly erred in its balance of the hardships. If indeed Buyers had a non-infringing alternative which it could easily deliver to the market, then the balance of hardships would suggest that Buyers should halt infringement and pursue a lawful course of market conduct.
Finally, regarding the public interest, this court disagrees with the district court’s reasoning that “the public may well be better served by having a new competitor, selling cheaper snowplow assemblies in what appears may be an untapped market segment.” J.A. 10. Of course, any infringer represents some form of competition with the originator of new technology. Moreover this new “competitor” will often find it easier to avoid the costs and risks of research and devel *1346 opment and just “compete” by infringement.
This court agrees with the general premise that competition serves the public interest. Among other things, it ensures competitive pricing and fosters innovation. In the present case, however, Buyers is competing in the marketplace using a competitor’s patented technology. For this reason, it has the advantage of undercutting prices and entering the “untapped market segment” of cheap snowplows. While the general public certainly enjoys lower prices, cheap copies of patented inventions have the effect of inhibiting innovation and incentive. This detrimental effect, coupled with the public’s general interest in the judicial protection of property rights in inventive technology, outweighs any interest the public has in purchasing cheaper infringing products. In sum, the public has a greater interest in acquiring new technology through the protections provided by the Patent Act than it has in buying “cheaper knockoffs.”
IV.
In regard to the reasonable royalty award for the '530 and '978 Patents, this court vacates and remands for the following reasons. First, the district court abused its discretion by applying the infamous 25% rule of thumb, which this court held in Uniloc was fundamentally flawed. Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1317 (Fed.Cir.2011). Second, the district court clearly erred by limiting the ongoing royalty rate based on Buyers’s profit margins. This court has held that an infringer’s net profit margin is not the ceiling by which a reasonable royalty is capped. Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1338 (Fed.Cir.2004). The infringer’s selling price can be raised if necessary to accommodate a higher royalty rate, and indeed, requiring the infringer to do so may be the only way to adequately compensate the patentee for the use of its technology. Thus, the district court clearly erred by ensuring the ongoing royalty rate it awarded would “leave some room for profit” by Buyers at its current prices.
V.
For the forgoing reasons, this court reverses the grant of summary judgment of noninfringement as to claim 45 of the '700 Patent. This court reverses the denial of a permanent injunction against continued infringement of the '978 Patent and instructs the district court to enter a permanent injunction consistent with this opinion. This court also vacates and remands the award of an ongoing royalty for the '530 and '978 Patents.
RE VERSED-IN-PART, VACATED-IN-PART, AND REMANDED.