**BELL HELICOPTER TEXTRON INC., Plaintiff,**

**v.**

**AIRBUS HELICOPTERS, Defendant.**

**Civil Action No. 10–0789 (RLW)**

United States District Court, District of Columbia.

Signed January 22, 2015

Eleanor Martha Yost, Jacob R. Osborn, Jennifer Ann Albert, Scott L. Robertson, Goodwin Procter, LLP, Washington, DC, Annemarie Hassett, Calvin E. Wingfield, Emily Ann Beman, Michael S. DeVincenzo, Timothy J. Rousseau, Goodwin Procter, LLP, New York, NY, Charles H. Sanders, Charles Wizenfeld, Michael Strapp, Samuel Edward Sherry, Goodwin Procter, LLP, Boston, MA, for Plaintiff.

Carmine Ralph Zarlenga, III, Brian A. Rosenthal, Clinton H. Brannon, Mayer Brown LLP, Washington, DC, Kyle E. Friesen, Trent L. Menning, Mayer Brown LLP, Houston, TX, Barry Clayton McGraw, Brian W. Nolan, Mayer Brown LLP, New York, NY, for Defendant.

## OPINION

ROBERT L. WILKINS, United States Circuit Judge (Sitting by designation in the United States District Court for the District of Columbia)

This matter is before the Court for disposition following a hearing on defendant Airbus Helicopters' motion for permanent injunctive relief. Upon consideration of the evidence submitted at trial, the parties' post-hearing briefs, and the relevant legal authorities, the Court finds that a permanent injunction is warranted, and will therefore grant the motion.

## I. BACKGROUND

### A. The Parties and the '621 Patent

This lawsuit involves a dispute between two of the largest distributors of commercial helicopters in the world: Bell Helicopter Textron, Inc. ("Bell"), and Airbus Helicopters ("Airbus"). Bell is a corporation organized under the laws of Delaware, and operates its principal place of business in Fort Worth, Texas. Compl. ¶ 4 (Dkt. No. 1); Counter–Compl. ¶ 4 (Dkt. No. 15). Airbus is a corporation constituted under French law, with its principal place of business in Cedex, France. Counter–Compl. ¶ 2.

Airbus owns a group of related patents that cover its sleigh-type landing gears: French Patent No. FR 96–07156 (the "French '156 Patent"), Canadian Patent No. 2,207,787 (the "Canadian '787 Patent"), and U.S. Patent No. 5,860,621 (the "'621 Patent"). See '621 Patent, at [30]; Compl. ¶ 18; Answer ¶ 18. The '621 Patent, titled "Helicopter Landing Gear with Skids," boasts of several improvements from conventional landing gears, including reductions in mass, load factor, manufacturing costs, and ground resonance. '621 Patent, col. 1 lines 33–44. The '621 Patent achieves its reduction in ground resonance by allowing the front cross-piece of the landing gear to move in both flexion and in torsion instead of in pure flexion, as is the case with conventional landing gears. Id. at col. 2, lines 10–20.

Claim 1 of the '621 Patent, which is the sole independent claim, reads as follows:

1. Helicopter landing gear, comprising a plurality of skids having a longitudinal support stretch for standing on ground and which are connected to a front cross-piece and a rear cross-piece for attachment to a structure of an aircraft by connecting devices, the rear cross-piece being fixed by ends of descending branches to a rear part of each said longitudinal support stretch, wherein each of said skids comprises a front comprising an inclined transition zone with double curvature oriented transversely with respect to each said longitudi-

nal support stretch to form together an integrated front cross-piece offset with respect to a front delimitation of a plane of contact of each said longitudinal support stretch of each of said skids.

*Id.* at col. 6, lines 50–62. An embodiment of this claim is illustrated below:

*Id.*, Drawing Sheet 1, Figure 1.

Witnesses in this litigation referred to the landing gear described in the '621 patent variously as the "Moustache landing gear," "sleigh landing gear," "sled landing gear," and/or, when referring to the version used on the Bell Model 429 helicopter, the "Original Gear." Oct. 20 AM Tr. at 34:3–14 (testimony of Pierre Prud'homme Lacroix); Oct. 20 AM Tr. at 64:14–17 (testimony of Bernard Certain); *id.* at 68:18–20; Oct. 22 AM Tr. at 27:2–28:5 (testimony of Robert E. Gardner); *id.* at 31:13–20.

### B. The Landing Gear Litigation

On May 9, 2008, Airbus and Airbus Canada Limited—then Eurocopter and Eurocopter Canada Limited, respectively—sued one of Bell's subsidiaries, Bell Helicopter Textron Canada Limited, for patent infringement, alleging that the Original Gear designed for the Bell Model 429 helicopter (the "Bell 429") infringed the Canadian '787 Patent. Compl. ¶ 21; Answer ¶ 21. Soon after the commencement of the Canadian action, Bell developed a new design for the Bell 429 landing gear (the "Modi-

fied Gear") and ceased its use of the Original Gear. Oct. 21 AM Tr. at 45:11–18 (testimony of Andrew H. Logan); Oct. 22 AM Tr. at 32:21–33:8 (Gardner).

In May 2010, Bell commenced the instant action, seeking a declaratory judgment for non-infringement and invalidity of the '621 Patent. Airbus filed counterclaims, alleging that both the Original Gear and the Modified Gear infringed the '621 Patent, and seeking injunctive relief and monetary damages. The parties subsequently asked the Court to construe a number of disputed claim terms in the '621 Patent. After conducting a hearing under *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), and reviewing the parties' briefs, the Court issued an opinion setting forth the claim constructions. *See Bell Helicopter Textron Inc. v. Eurocopter,* 876 F.Supp.2d 71, 73 (D.D.C.2012).

The parties agreed that the Original Gear infringed claim 1 of the '621 patent as construed by the Court. Jt. Pretrial Statement ¶ 39 (Dkt. No. 142).[1] They

---

1. Bell agrees that the Original Gear meets all of the limitations in claim 1, but has reserved the right to challenge the validity of the patent if, on appeal, the Modified Gear is deemed to

fiercely disputed, however, whether the Modified Gear infringed the '621 patent, and also whether any infringement warranted damages or injunctive relief. The parties submitted summary judgment briefing on these issues, and on August 15, 2014, the Court held that the Modified Gear did not infringe the '621 patent, either literally or under the doctrine of equivalents. *See* Mem. Opinion at 6–14 (Dkt. No. 104). The Court also held that Airbus was barred from seeking damages for acts of infringement prior to October 29, 2010, due to Airbus's failure to mark its patented landing gear. *Id.* at 14–15; *see* 35 U.S.C. § 287(a). The Court declined to grant summary judgment on injunctive relief or damages for any post-October 29, 2010 acts of infringement, noting that expert discovery on damages was not yet complete. *See* Mem. Opinion at 15–21.

The case was set for trial on injunctive relief and damages for any infringement that had taken place after October 29, 2010. Through the parties' pre-trial motions, however, it became apparent that Airbus was unable to put forth a viable theory of infringement occurring after October 29, 2010, and instead intended to rely on legally irrelevant evidence of infringement occurring prior to that date for the purpose of showing damages.

As a result, at the pre-trial conference held on September 23, 2014, the Court granted Bell's motion *in limine* to exclude such evidence. Sept. 23 Tr. at 78:6–89:24; Oct. 1, 2010 Order (Dkt. No. 169). Because the parties agreed that exclusion of this evidence would effectively foreclose Airbus's theory of damages, the Court

treated Bell's motion as a renewed motion for summary judgment. Sept. 23 Tr. at 81:10–82:8. Even when viewing the evidence in the light most favorable to Airbus, the Court found that there was no genuine question of material fact as to infringement occurring after October 29, 2010. *Id.*

Although Airbus's failure to mark its landing gear precluded the award of monetary damages for pre-October 29, 2010 acts of infringement, Airbus was still entitled to seek an award of injunctive relief based on any such acts. Airbus elected to pursue a permanent injunction against Bell, in order to prevent Bell from utilizing the Original Gear (or any other landing gears that infringe the '621 patent) in the future. A three-day hearing was held from October 20 to October 22, 2014, and the parties subsequently submitted post-hearing briefs.

The Court now makes the following findings of fact and conclusions of law, as required under Rule 52 of the Federal Rules of Civil Procedure.

## II. FINDINGS OF FACT

### A. Infringement

#### i. Airbus's development of a sleigh-style landing gear

1. The development of helicopter landing gears is very complex and time consuming, and conventional landing gears can have a number of drawbacks, including high load factors, difficult frequency adaptations for purposes of ground resonance,

---

fall within the scope of the '621 patent. Sept. 23 Tr. at 47:9–48:12 (Pretrial Conference); *see* Bell's Responses to Airbus's Proposed Finding of Fact ¶ 6 (Dkt. No. 204–3 at 3) (contending that "the evidence established that the sleigh type landing gear was in the public domain well before the priority date of

the '621 patent"); Minderhoud Dep. 83:12–84:9 (testimony that "there are figures of landing gears—sleigh type landing gears which are already 20, 25 years, 30 years old. So it is not a new concept, it is not a new shape.").

and rather high landing gear weight. Minderhoud Dep. Tr. at 133:7–10;[2] DX–99; Oct. 21 AM Tr. at 37:12–38:7 (Logan).

2. Ground resonance is a serious phenomenon that can occur in multi-bladed helicopters (i.e., helicopters with more than two blades) depending largely on the stiffness of the helicopter's landing gear, as the landing gear responds to the vibrations generated by the helicopter's rotor, which may in turn amplify the movement of the helicopter, cause the helicopter to become unstable, and in some cases destroy it. Oct. 20 AM Tr. at 37:13–22, 39:16–21 (Lacroix); Oct. 20 AM Tr. at 61:4–8 (Certain); DMX–12; Minderhoud Dep. Tr. at 94:3–95:1.

3. When Airbus developed its first prototype of the EC–120 aircraft, one of its single engine helicopters, it used conventional landing gear that was not satisfactory with respect to ground resonance. Oct. 20 AM Tr. at 37:2–8 (Lacroix); Oct. 20 AM Tr. at 60:21–61:3 (Certain).

4. Airbus developed the Moustache landing gear at the end of 1995 or early 1996. Airbus Helicopters engineer Pierre Prud'Homme Lacroix performed the air frame analysis related to the Moustache landing gear, and engineer Joseph Mairou performed the design and the integration of the Moustache gear into the EC–120's airframe. Oct. 20 AM Tr. at 40:24–41:20 (Lacroix).

5. The result of the predefinition phase was an acceptable landing gear design in terms of stiffness in the helicopter's roll mode for ground resonance. Oct. 20 AM Tr. at 42:22–43:7 (Lacroix).

6. The Moustache gear prototype was then installed on the prototype EC–120 and was flight tested in July of 1996. Oct. 20 AM Tr. at 43:8–22 (Lacroix).

7. Airbus' Flight Test Engineer for the EC–120 program, Bernard Certain, concluded that there were no ground resonance problems with the new Moustache gear, which performed perfectly. Oct. 20 AM Tr. at 43:23–44:5 (Lacroix); Oct. 20 AM Tr. at 59:3–12, 64:2–11 (Certain).

8. Mr. Certain asked that a patent be applied for on its design, which in turn led to Airbus' '621 patent. Oct. 20 AM Tr. at 67:2–18 (Certain); DX–001.

9. Airbus uses the patented landing gear on its EC–120 and EC–130 helicopters. Arfi Dep. Tr. at 39:19–40:4.[3]

ii. Bell's adoption of infringing gear

10. Bell's Modular Affordable Product Line ("MAPL") was a design project under lead engineer Malcolm Foster to try to design modular components that could be used on multiple aircraft; the landing gear that was developed as part of the MAPL project grew into the Original Gear of the Bell 429. Gardner Dep. Tr. at 44:1–11, 44:15–22, 59:5–8.[4]

11. Prior to the Bell 429, every Bell helicopter that used a skid landing gear used a conventional skid landing gear; as part of the MAPL program, a task force at Bell was charged with evaluating landing gear options for use on new Bell helicopters. Minderhoud Dep. Tr. at 58:5–12;

2. A videotape of Airbus's Deposition Designations of Peter Minderhoud, with Bell's counter-designations, was played in open court on October 20, 2014. *See* Oct. 20, 2014 PM Tr. at 4–6.

3. Airbus's Deposition Designations of Fabrice Arfi, with Bell's counter-designations, were admitted as DX–365.

4. Those portions of Robert Gardner's deposition testimony discussed during his cross-examination were admitted as DX–357. *See* Oct. 22 AM Tr. at 115:14–116:16.

Oct. 21 PM Tr. at 25:11–27:18 (Kerr); DX–104.

12. Bell's Peter Minderhoud was involved in the development of the Original Landing Gear for the Bell 429, Bell's Mithat Yuce was the lead dynamicist for the Bell 429 and was involved in dynamics and assessing ground resonance characteristics for the landing gear in both the MAPL program and the Bell 429 program, and Bell's Robert Gardner was a stress analyst, and later served as leader of the structures analysis team on the Bell 429 program. Oct. 22 AM Tr. at 22:14–23 (Gardner); Gardner Dep. Tr. at 46:13–18, 47:12–48:5; Yuce Dep. Tr. at 20:2–12.[5]

13. As a result of an "aggressive" corporate development schedule for the Bell 429, Bell's team leader Robert Gardner felt that he was under "time pressure" on the Bell model 429 project, and that Bell was "at risk" on the Bell 429 program. Oct. 22 AM Tr. at 82:15–83:3, 83:15–84:11 (Gardner); Gardner Dep. Tr. at 168:13–169:6.

14. Bell's engineers recognized that the Bell 429 "program risk" could be reduced by investigating the landing gear properties for Airbus's EC–120. Minderhoud Dep. Tr. at 103:4–16, 104:6–18; Oct. 22 AM Tr. at 113:9–114:17 (Gardner); DX–32.

15. Bell leased an EC–120 helicopter for several months in 2003 and studied the EC–120's landing gear—for example, conducting flight tests and handshake tests on the EC–120 while Bell was still developing the Bell 429 landing gear. Minderhoud Dep. Tr. at 65:3–67:11, 67:15–21, 68:13–20, 69:8–13; Oct. 21 PM Tr. at 27:11–28:1 (Kerr); DX–32; DX–34.

16. As a result of their study, Bell's employees determined that the EC–120 landing gear had good damping characteristics, and exceptional damping for the modes important to ground resonance. Bell's engineers never discovered exactly what the source of the high damping in the EC–120 landing gear was. DX–34 at BELL0036074 ("We noticed during shake tests last week that this gear [of the EC–120] provides exceptional damping for the modes important to ground resonance."); Yuce Dep. Tr. at 99:21–100:9 (agreeing that "Bell never discovered exactly what the source of the high damping [in the EC–120 gear] was").

17. Accordingly, Bell decided to adopt "the sled gear (per the EC–120)" as its baseline design for the Bell 429 landing gear. Oct. 22 AM Tr. at 31:13–20 (Gardner); Gardner Dep. Tr. at 138:1–139:12; Minderhoud Dep. Tr. at 89:13–90:11; DX–32 at BELL0034245 ("[R Gardner] The baseline skid gear configuration is the sled gear (per the EC–120).").

18. Bell decided to use the sleigh gear design because it was the lightest configuration, and because Bell believed it was more aesthetically pleasing, provided better wire strike protection than conventional gears, and because it "had lower risk for the fore/aft resonance mode." DX–99 at 2; Minderhoud Dep. Tr. at 77:19–78:20; Minderhoud Dep. Tr. at 90:15–92:4; DX–32 at BELL0034245.

19. The final weight of the sleigh type landing gear for the Bell 429 was 108 pounds, which Mr. Minderhoud viewed as a very good result, and Bell was happy with that weight because a conventional gear was heavier. Minderhoud Dep. Tr. at 158:3–159:12 ("[C]ompared to what was the general experience with the weight of a landing gear, we were happy with this

---

**5.** Airbus's Deposition Designations of Mithat Yuce, with Bell's counter-designations, were

admitted as DX–367.

weight ... [b]ecause it was even a little lighter than that was expected at the time.").

20. Though he was responsible for the structures analysis team that included the Bell 429's landing gear, and also served as the corporate representative at Bell's Rule 30(b)(6) deposition, Mr. Gardner has stated that he does not know whose idea it was to use a sleigh-type landing gear on the Bell 429. Gardner Dep. Tr. at 55:20–56:22; Oct. 22 Tr. at 31:23–32:1, 126:19–127:16, 128:16–129:14 (Gardner).

21. Robert Gardner was not credible in his testimony that no one at Bell could tell him who developed the sleigh-type landing gear, see supra at FF. 20, in light of the fact that he came to Bell and started working on the MAPL Project within a year of that decision being made, see Oct. 22 AM Tr. at 21:15–25:22, he was a part of the structural team which had responsibility for landing gear, id., and he had concerns about the fact that Bell was copying a competitor's landing gear, see infra at FF. 25–26. Furthermore, his statement that he was not involved in the decision, see Oct. 22 AM Tr. at 31:23–32:1, is undermined by email evidence, see DX–32, and the testimony of his former colleague. See Minderhoud Dep. Tr. at 78:12–79:5.

iii. Knowledge of the '621 patent

22. Airbus did not mark the landing gear on the EC–120 with the patent number. Oct. 20 PM Tr. at 52 (testimony of Alex Youngs); Oct. 21 AM Tr. at 56:8–10 (Logan).

23. There is no evidence in the record that Bell officials knew that the '621 patent existed. Oct. 21 AM Tr. at 55:18–56:14 (Logan).

24. Bell's Peter Minderhoud knew at the time he was working on the development of the Bell 429 about Airbus's use of a sleigh-type gear on the EC–120. Minderhoud Dep. Tr. at 84:10–18,85:4–8.

25. When Mr. Gardner heard that Bell was considering a sleigh-type landing gear, he recognized that it was the same or similar shape as that of the EC–120 and brought it to the attention of Malcolm Foster and Bryan Linnington. Gardner Dep. Tr. at 59:5–20; Oct. 22 AM Tr. at 32:2–20 (Gardner).

26. Mr. Gardner's interpretation of Mr. Foster's response was that he should in essence carry on with the project. Gardner Dep. Tr. at 62:10–13 (Q. "And when you told Mr. Foster about this, he didn't seem surprised at all, did he?" A. "No."); id. at 63:17–22 (Q. "And Mr. Foster's response was 'carry on'; that's how you interpret it?" A. ".... Essentially, yes."); Oct. 22 AM Tr. at 108:10–109:2 (Gardner).

27. Bell has had an IP policy since at least 2002 that states that:

Textron's policy is to respect, avoid and not infringe the valid intellectual property rights of others. Textron operation managers, through their respective IPRT, are responsible for ensuring compliance with that policy. That requires that, whenever Textron commercializes a new product or process, the IPRT must have formed a good faith belief that there is no patent, trademark or copyright infringement and there has been no trade secret misappropriation. A good faith belief, may, in the judgment of the IPRT, rest upon the knowledge of the Team respecting the industry and, in certain instances, may require appropriate patent clearance or trademark clearance before new product commercialization.

DX–140 at BELL0023189. Bell's Robert Gardner could not recall seeing this policy. Gardner Dep. Tr. at 187:9–18; Oct. 22 AM Tr. at 105:12–109:6.

28. A group of Bell employees, including Robert Gardner, Peter Minderhoud, and Guy Lambert, came up with the idea for the Modified Gear at a brainstorming session in July of 2008, and in August 2008, Bell decided to use it. Gardner Dep. Tr. at 75:2–77:6; Oct. 22 AM Tr. at 32:21–33:21 (Gardner); DX–3 at BELL0001450 ("In August 2008, BHCTL decided to make Standard Landing Gear P/N 429–336–902 (hereafter referred to as "production standard landing gear") the landing gear configuration to be certified as part of the Model 429 Initial Certification currently planned for 13 February 2009.").

29. Bell asserts that its engineers had disclosed the sled gear design almost twenty years before Airbus employed it in the EC–120. *See* Bell. Opp. 13. This claim was not fully developed by the evidence put forth at the hearing, and is undercut by the evidence that Bell leased an EC–120 and copied its landing gear.

iv. Manufacture of the infringing gear

30. The Original Gear was manufactured in Tennessee by Aeronautical Accessories, Inc., which is a wholly owned subsidiary of Edwards and Associates, which in turn is a wholly owned subsidiary of Bell. Gardner Dep. Tr. at 308:6–13; Oct. 21 AM Tr. at 34:22–35:10 (Logan); DX–27 at BELL00031708; Oct. 22 AM Tr. at 75:25–78:4 (Gardner); DX–362.

v. Use of the infringing gear

31. Bell performed drop tests of the original sleigh type landing gear in 2006 at Bell's Mechanical Systems Test Laboratory in Fort Worth, Texas, for the purposes of satisfying the certification requirements for airworthiness. Oct. 22 AM Tr. at 82:1–4; Gardner Dep. Tr. at 70:2–5, 72:14–19; Oct. 21 Tr. at 29:17–24, 31:17–32:8, 33:15–21 (Logan); DX–27 at BELL0031676 ("All testing was performed between November 27, 2006 and December 8, 2006 in the Mechanical Systems Test Laboratory of Bell Helicopter Textron, Inc., Fort Worth, Texas."); Oct. 21 Tr. at 32:17–33:14 (Logan) ("The test was done to satisfy the certification requirements as part of the compliance matrix.").[6]

32. To test the structural integrity of a landing gear, "drop tests" are performed where an actual helicopter landing gear is dropped on the ground under various conditions to check for permanent deformation and whether the helicopter body would strike the ground. Oct. 21 AM Tr. at 25:21–26:6, 26:12–18 (Logan).

33. The tests determine whether the landing gear is strong enough to withstand the loads of the aircraft, and whether the helicopter body would strike the ground upon impact. Oct. 20 AM Tr. at 45:25–47:1 (LaCroix); Oct. 21 AM Tr. at 24:3–9, 25:21–26:6, 26:12–18 (Logan).

34. Helicopters are marketed in a variety of ways, including trade shows, brochures, presentations, and press releases; at trade shows, manufacturers bring one or more aircraft and multiple sales people so that they can present and sell their helicopters to customers and potential customers. Oct. 20 PM Tr. at 28 (Youngs).

35. HELI–EXPO is the main trade show for the industry, and takes place in the United States every year; both Airbus and Bell participate in this trade show. Oct. 20 PM Tr. at 29 (Youngs).

36. The first time that Bell showed a production version of the Bell 429 was in 2008 when HELI–EXPO was held in

6. Although Bell questions whether the tests were performed by Bell or Bell Helicopter Textron Canada, *see* Bell's Responses to Airbus's Proposed Findings of Fact ¶ 45, the fact that the tests were performed at a Bell facility and documented in a report prepared by Bell indicates that the tests were performed, at least in part, by Bell.

Houston, Texas; a Bell 429 was displayed there equipped with the Original Gear. Oct. 20 PM Tr. at 29–31 (Youngs); DX12 at ECDC0045298.

37. At that event, a Bell 429 with the Original Gear flew and landed on its gear; the event was featured prominently in the April 2008 Bell 429 Newsletter, which pictured the Bell 429 with the Original Gear flying around the Houston skyline. Oct. 20 PM Tr. at 32 (Youngs); DX–12 at EC–DC0045299.

38. Bell was responsible for putting on its displays and demonstrations at trade shows such as HELI–EXPO. Oct. 20 PM Tr. at 31–33 (Youngs); DX–12 at ECDC0045298.

39. All Bell Helicopter communications and marketing activities worldwide are led by Bell's marketing group in Ft. Worth, Texas, under Charles Evans; by contrast, Bell Helicopter Textron Canada does not have a marketing director. Oct. 22 PM Tr. at 34:11–25, 45:17–21 (testimony of Charles Evans).

vi. Offers to sell the infringing gear

40. A letter of intent is typically used as the first step in the sales process for a helicopter; it contains a general description of the aircraft being offered for sale, is signed by the person who intends to buy it, and usually includes a down payment or monetary exchange. Oct. 21 AM Tr. at 43:1–8 (Logan).

41. Bell entered into approximately 330 letters of intent with customers prior to the conception of the Modified Gear in the middle of 2008. Lambert Dep. Tr. at 54:12–14, 58:20–59:3; Oct. 20 PM Tr. at 50 (Youngs).[7]

42. At the time those letters of intent were signed, only the Original Gear was on the Bell 429. 10/21/2014 PM Hearing Tr. at 3:9–4:19 (Kerr).

43. The letters of intent were structured in a way that they became firm orders, and deposits became nonrefundable, once the Bell 429 Model had its "first flight." *See* Oct. 22 PM Tr. at 37:14–40:5 (Evans) (all deposits on letters of intent were refundable until the first flight of the 429); DX–347 (sample letter of intent indicating that "until first flight, Seller does not have the obligation to complete development of the 429 and Seller shall retain the right to cancel the program").

44. Although Evans testified that the first flight of the Bell 429 took place around July 2008 or July 2009, a newsletter produced by Bell states that the first flight took place on February 27, 2007, in Mirabel, Canada. PX242 at Bell0028579. The Court credits this document.

*B. Irreparable Injury*

i. Loss of market share from earlier introduction

45. Bell and Airbus are major competitors that compete directly in the sale of helicopters on a worldwide basis. Oct. 20 PM Tr. at 16 (Youngs); Oct. 22 PM Tr. at 28:19–30:4 (Evans).

46. The Bell 429, Airbus's EC–135, and Airbus's EC–145 all are light twin engine helicopters; the Bell 429 helicopter competes directly with the EC–135 and EC–145 aircraft. Oct. 20 PM Tr. at 21 (Youngs); Oct. 22 PM Tr. at 12:23–13:12 (Evans); Oct. 22 AM Tr. at 7:18–21 (Kerr); Arfi Dep. 16:5–14; 44:19–45:6.

47. Prior to the introduction of the Bell 429 in 2008, Airbus had between 60 and

---

**7.** Airbus's Deposition Designations of Guy Lambert, with Bell's counter-designations, were admitted as DX–366.

65% percent of the global light twin market segment with sales of its EC–135 and EC–145 helicopters, and since the introduction of the Bell 429, Airbus Helicopters' global market share in the light-twin segment has decreased to below 50%. Arfi Dep. Tr. at 17:3–20:4,184:5–185:3; Oct. 20 PM Tr. at 27 (Youngs); Oct. 21 PM Tr. at 31:11–13 (Kerr).

48. In the U.S. market, Airbus has seen its market share reduced from 75% to approximately 70% since the Bell 429 was introduced, while the Bell 429 has achieved a market share of over 15%. Oct. 20 PM Tr. at 27–28 (Youngs).

49. At least some of the lost market share for the EC–135 and EC–145 is due to the Bell 429, as the introduction of the Bell 429 was one of the only changes, if not the only change, in the market in recent years, and because most of the time when Airbus has lost sales to competitors it has been to the Bell 429. Arfi Dep. Tr. at 87:19–88:9 ("[T]he only thing that's new that's come up in the recent years is the Bell 429" and "most of the time when we've lost competitions, it's been to the Bell 429."); Oct. 21 PM Tr. at 31:3–13 (Kerr) ("[T]he 429 has taken a significant chunk of the market, much of which has come … from the EC135 and 145."); Oct. 20 PM Tr. at 23 (Youngs).

50. The 429 program was a complex program, and the landing gear was a relatively small part of the helicopter design. Oct. 22 AM Tr. at 30:3–19, 33:22–33:4, 120:9–15 (Gardner).

51. Nevertheless, landing gear is not an insignificant part of the whole helicopter design, and it can be "very complex and time-consuming." Minderhoud Dep. Tr. at 133:7–10; see also DX–99; Oct. 21 AM Tr. at 37:12–38:7 (Logan); DMX–12; Minderhoud Dep. Tr. at 94:3–95:1 (noting that the wrong landing gear can lead to the destruction of the aircraft).

52. Bell was able to accelerate the development of the Bell 429 by using the Original Gear during the development process—originally by marketing the aircraft, and then by achieving certification of the aircraft—allowing Bell to save costs during the development of the Bell 429. Oct. 21 PM Tr. at 18:9–24 (Kerr).

53. The resources Bell devoted to the 429 landing gear development were minor in context: 1 out of 24 structural analysts and 4–5 designers out of a 300–person team worked on the landing gear. Oct. 22 AM Tr. at 25:13–26:6 (Gardner).

54. It is likely, however, that Bell was able to reduce resources devoted to landing gear design by copying the patented Moustache landing gear from the EC–120 that it rented and tested. See Minderhoud Dep. Tr. at 65:3–67:11, 67:15–21, 68:13–20, 69:8–13, 103:4–16; id. at 104:6–18 ("Where you make a wrong landing gear, with wrong properties, then you cannot fly … getting the new parts will take at least two or three years"); Oct. 22 AM at 31:13–20, 113:9–114:17 (Gardner); DX–32 at BELL0034245 ("[Gardner] The baseline skid gear configuration is the sled gear (per the EC–120).").

55. As noted supra at FF. 31, Bell conducted drop tests using the Original Gear.

56. Bell documented those drop tests in a two-part document prepared by Bell employee James Stevens for the purpose of demonstrating to the authorities the integrity of the structure of the gear. Oct. 21 AM Tr. at 32:12–36:17 (Logan); DX–27 at BELL0031721, BELL00031675, and BELL00031657.

57. Bell Helicopter Textron Canada used ground resonance tests conducted on the Original Gear to calibrate a software analytical model it then used to show com-

pliance with the ground resonance regulatory requirements with respect to the Modified Gear. Lambert Dep. 47:6–9, 47:14–19, 48:2–11; DX–3 at BELL0001389 ("Most of the ground resonance substantiation tests were conducted on ... a production representative landing gear.... Additional ground resonance tests were conducted with a prototype landing gear ... and the results of those were used to validate the analytical model as well as demonstrate the effects of the test surface on the ground resonance characteristics.").

58. The regulatory type certificates that allow Bell to sell the Bell 429 in the United States and Canada were obtained based in part on the testing information from the Original Gear; every Bell 429 that has been sold in the United States has been sold pursuant to those type certificates. Lambert Dep. Tr. at 60:12–16 ("[T]hose type certificates are what allows Bell to sell the 429 in Canada and in the U.S."); *id* at 60:18–61:15 ("[T]hese type certificates were obtained, in part, on the basis of testing information from the Legacy gear" and "every Bell 429 helicopter that's been sold in the United States has been sold pursuant to the type certificate that was issued with respect to the 429 ...").

59. Some of the customers who purchased Bell 429s would likely have purchased Airbus helicopters had the Bell 429s not been available. *See supra* at FF. 45–49.

60. Once an Airbus customer begins purchasing Bell helicopters, the customer is more likely to purchase additional aircraft from Bell than it otherwise would have. Oct. 20 PM Tr. at 24:5–8 (Evans).

61. There is no evidence that Airbus lost sales of its EC–130 because of Bell's adoption of the Original Gear. Although Airbus contends that the Bell 429 competes "to some extent around the mar-

gins" with the EC–130, the evidence is more persuasive that there is only minimal competition between these two types of aircraft. The EC–130 is a single-engine aircraft and the price points are very different. *See* Oct. 22 PM Tr. at 12:23–13:12 (Evans); Arfi Dep. 44:19–45:17; Arfi Dep. 77:11–78:9; 10/22/14 PM Tr. at 5:23–6:22, 57:17–58:12 (expert testimony of Krista Holt).

62. Bell's letters of intent do not indicate any specific landing gear to be used with the Bell 429. DX–347 at BELL0037478, BELL0037488. The letters also indicate that "[c]onfiguration changes may be made at any time by Seller to conform to regulations ... or Seller's current manufacturing or engineering requirements without the consent of Purchaser so long as such revisions do not result in a reduction of the performance[.]" DX–347 at BELL0037478.

63. Consumer demand for helicopters is driven by the price of the aircraft, the direct operating costs associated with flying the aircraft, the speed of the aircraft, the range of the aircraft and the hover performance of the aircraft. Oct. 22 PM Tr. at 9:3–15 (Evans); Oct. 20 PM Tr. at 42–43 (Youngs).

64. Secondary factors that drive consumer demand within the commercial helicopter market include the avionics used in the helicopter, the noise profile of the helicopter, the seating configuration and the size of the cabin. Oct. 22 PM Tr. at 9:16–24 (Evans); Oct. 22 PM Tr. at 59:7–62:11 (Holt); PX–198.

65. Customers generally do not make their purchasing decisions based on the landing gear on an aircraft. *See* Oct. 22 PM Tr. at 11:20–23 (Evans testifying "in [his] experience, [the landing gear on an aircraft is] not a decision criteria that [he has] experienced"); Oct. 20 AM Tr. at

86:11–16 (Certain testifying that "probably ... the customer[s] are not interested by the technology of the landing gear," because, for example "if you explain to the customer how to solve the ground resonance, it's not interested").

66. Airbus cites only a smattering of hearsay evidence that certain customers expressed particular interest in the sleigh-style landing gear. *See* Arfi Dep. Tr. at 73:15—74:5 ("And clearly the mustache landing gear has come up in these [customer satisfaction] reports ... as providing strong customer benefits such as more safety, what we call energy absorption, more lower maintenance costs, more comfort due to ground resonance effect."); *id.* at 82:4–20 (testifying that "at least" customers "Blue Hawaii and Papillon" had "mentioned the landing gear of the EC 120 and 130 as a reason that they purchased that helicopter").

67. Airbus did not tout the design of the patented landing gear in its marketing materials. Instead, Airbus touted cabin size, the cockpit, comfort, and other features. Oct. 22 PM Tr. at 62:15–64:19 (Holt); PX–182.

68. Bell generally did not tout the Original Gear or the Modified Gear in its promotional literature for the Bell 429. Bell instead emphasized features such as the state-of-the-art cockpit, large cabin size, price, smooth ride, and customer support. Oct. 22 PM Tr. at 13:25–26:18 (Evans); PX–72; PX–195; PX–196; PX–208; *see also* Oct. 22 AM Tr. at 42:22–54:11 (Gardner); PX–240; PX–241; PX–242; PX–99; PX–100; PX–89; Oct. 22 PM Tr. at 62:12–14 ("Q: Did you see any Bell marketing material touting the design of the landing gear? A: No, I did not.") (Holt).

69. Airbus's chief engineer for the EC–120 program, Bernard Certain, presented a paper on the EC–120 in 1997 to the American Helicopter Society. That helicopter had Airbus's moustache landing gear, but the landing gear was not mentioned in the paper. Oct. 20 AM Tr. at 59:13–19, 73:2–18; 74:19–78:9 (Certain); PX–265.

70. Notwithstanding the alleged benefits of the patented landing gear, Airbus offers many helicopters that do not have the patented landing gear, including the EC–135 and EC–145. Oct. 20 PM Tr. at 44:22–45:5 (Youngs); Oct. 22 PM Tr. at 58:13–59:6 (Holt); Oct. 20 AM Tr. at 52:5–12 (LaCroix) (testifying that "[w]hen a conventional landing gear works, there is no reason to replace it."); Oct. 22 AM Tr. at 7:22–8:2 (Kerr).

71. Airbus's corporate representative Mr. Arfi testified that the business case had not been made for replacing the conventional landing gear on the EC–135 and EC–145 with the patented landing gear. Arfi Dep. at 72:15–73:14. ("Q: If Eurocopter considered the mustache landing gear to have certain benefits over the preexisting land[ing] gears on the EC–135 and EC–145, why didn't it retrofit those helicopters with the mustache landing gear? A: As far as I know, these types of considerations are major considerations in terms of business case. ... There are a lot of engineering work and development involved. So the only answer I could provide to you is, I don't think the business case was demonstrated."). This lack of a business case for a landing gear retrofit tends to show that Airbus does not believe that landing gear materially influences sales for a helicopter. Oct. 22 PM Tr. at 58:15–59:6 (Holt).

72. Even if customers are not interested in specific landing gear technology, they are interested in helicopter factors affected by landing gear performance, particularly the range of the helicopter. *See supra* at

FF. 63; *see also* Oct. 22 PM Tr. at 20:2–3 (Evans) (testifying that range is an important feature to customers); *id.* at 16:16–22 (testifying that wire strike protection provides a safety feature that customers find important).

73. Airbus Helicopters, Inc., not the Defendant Airbus, sells Airbus helicopters within the United States. Oct. 20 PM Tr. at 39:17–40:5 (Youngs); PX–44 at 72 (Response to Request for Admission No. 138).

ii. Damage to Airbus's reputation

74. With over 60 percent of the global market share in 2008, Airbus has been a leader in the light twin helicopter market segment. *See supra* at FF. 47.

75. Airbus has developed many innovations in the field; for example, with the development of the Fenestron anti-torque device, and innovations with composite rotor blades. Oct. 20 PM Tr. at 14–15 (Youngs).

76. The first sale of an EC–120 helicopter with the Moustache gear was at the end of 1997 or early 1998. Oct. 20 AM Tr. at 51:18–23 (LaCroix).

77. From 2005–2008, Bell actively marketed the Bell 429 with the Original Gear. Oct. 21 PM Tr. at 31:18–32:5 (Kerr).

78. From 2005–2008, Bell publicly advertised the Bell 429 in various trade journals and advertising materials or made use of static mockups or aircraft which incorporated the Original Gear, Oct. 22 AM Tr. at 6:11–15 (Kerr); Oct. 22 AM Tr. at 42:22–54:11 (Gardner); PX–240; PX–241; PX–242; PX–99; PX–100; PX–89; Oct. 22 AM Tr. at 86:3–87:2 (Gardner), although the Original Gear was not emphasized, *see supra* at FF. 68.

79. Sometime prior to April 29, 2008, Minderhoud authored an article entitled "Development of Bell Helicopter's Model 429 Sleigh Type Skid Landing Gear," which he presented at the American Helicopter Society's 64th Annual Forum—an important and prestigious organization and forum for the helicopter industry—in Montreal, Canada, in April–May 2008. DX–99; Oct. 20 AM Tr. at 88:4–97:10 (Gardner); Gardner Dep. Tr. at 91:22–92:16.

80. Mr. Minderhoud presented his article to approximately 60 people at the American Helicopter Society Annual Forum, and it was distributed to all 300 to 400 attendees of the conference. Minderhoud Dep. Tr. at 145:1–18.

81. The article stated on the top of the first page in the section labeled "ABSTRACT" that: "A sleigh type skid landing gear has been designed for the first time by Bell Helicopter Textron for use on its new Model 429 civil helicopter." DX–99 at 1.

82. The most reasonable interpretation of the abstract of the Minderhoud article is that the first time that anyone designed a sleigh gear, it was Bell. DX–99 at 1.

83. The "ABSTRACT" section is for someone who just wants a quick summary of what is in the content of the article without necessarily reading the paper, and some people would probably just read that summary. Oct. 22 AM Tr. at 88:24–89:11 (Gardner).

84. The pictures of the sleigh gear shown in the Minderhoud article and in photographs of the Bell 429 prior to August of 2008 are of a landing gear that meets all the limitations of the asserted claims of the '621 patent. DX–99; DX–1.

85. Bell's Robert Gardner reviewed the article, helped edit it, and approved it prior to publication. Gardner Dep. Tr. at 87:6–17; Oct. 22 AM Tr. at 54:19–25 (Gardner).

86. Mr. Minderhoud's understanding of the purpose of this paper was to show people from other companies the develop-

ments Bell was making. Minderhoud Dep. Tr. at 123:2–7.

87. Mr. Minderhoud cited a Bell patent in his article, but he did not cite Airbus's '621 patent in that article. DX–99. When he learned of the '621 patent, he took no steps to modify his article to reflect that point. Minderhoud Dep. Tr. at 214:15–215:12.

88. Gardner's testimony was not credible when he said that he did not believe that the article created the misleading impression that Bell designed the sleigh-type landing gear. *See* Oct. 20 AM Tr. at 56:1–57:24 (Gardner). Gardner's testimony on the point was exceedingly defensive and evasive.

89. To the extent that Bell designed anything, it was simply how to modify the Airbus landing gear to attach to its helicopter. Oct. 20 AM Tr. at 122:15–123:15 (Gardner). But those design decisions are not what was featured in the article. *Id.* at 123:23–126:2; DX–99. The article primarily touted the aspects of the landing gear that Bell had nothing to do with creating. DX–99.

90. Bell actively represented the Original Gear to be a significant new breakthrough and benefit of the Bell 429, and Bell misrepresented the Original Gear as its own invention. *See* DX–99; Oct. 21 PM Tr. at 31:18–32:5 (Kerr).

### iii. Airbus's delay in bringing suit in the United States

118. Airbus became aware of the Bell 429 as of 2005 or early 2006. Arfi Dep. 14:7–15:2; Oct. 20 PM Tr. at 42 (Youngs).

119. Airbus's Mr. Certain first saw the Bell 429 at an air show in 2007. Oct. 20 AM Tr. at 67:21–68:6, 86:17–24 (Certain).

120. Mr. Certain testified that he thinks it is true that "when [he] went back to inform the strategy team at Eurocopter, they already knew of the sleigh gear for the Bell 429 helicopter because they'd seen the aircraft in the U.S. in 2006." Oct. 20 AM Tr. at 86:20–24 (Certain).

121. By at least September 2006, the Bell 429 was the focus of competitive analysis at Airbus. Oct. 20 PM Tr. at 42 (Youngs).

122. In 2008, Airbus determined that it believed that the Bell 429 infringed the '621 patent. Oct. 20 PM Tr. at 42 (Youngs).

123. Airbus brought a patent infringement suit in Canada against Bell Helicopter Textron Canada in 2008 and in France in 2009. *See* Oct. 22 AM Tr. at 32:21–33:4 (Gardner); *see also* Compl.

124. Airbus filed the instant counterclaim against Bell in 2010. *See* Answer and Counter–Compl.

### C. Adequacy of Legal Remedies

125. While Airbus has no established policy of licensing its technology to others, it will engage in licensing as necessary on a reasonable basis. Oct. 22 AM Tr. at 9:17–21 (Kerr); Oct. 22 PM Tr. at 78:2–10 (Holt); PX–46 at Response to Interrogatory No. 13.

126. Airbus Helicopters has not licensed any other company to use the technology of the '621 patent. Oct. 20 PM Tr. at 35–36 (Youngs).

### D. Balance of Hardships

127. After Airbus sued Bell for patent infringement in Canada in 2008, Bell quickly changed the design of the landing gear. Oct. 21 AM Tr. at 56:11–18 (Logan); Oct. 22 AM Tr. at 32:21–33:21; 34:20–35:13, 79:17–81:1 (Gardner); PX–249.

128. Only 21 Original Gear units were ever manufactured. Oct. 22 AM Tr. at 5:10–12 (Kerr).

129. Soon after commencement of the Canadian action, Bell created a new design

268

for the Bell 429 landing gear, which Bell began exhibiting, and quarantined in Canada the previously produced units of the Original Gear that were then in stock. Oct. 22 AM Tr. at 5:13–18 (Kerr); Oct. 22 AM Tr. at 34:20–36:18 (Gardner); PX–253; Gardner Dep. 74:9–17, 75:2–6; Lambert Dep. 40:12–19.

130. 20 of 21 units of the Original Gear were destroyed in response to the Canadian lawsuit. Oct. 22 AM Tr. at 36:25–37:8; 37:24–39:10 (Gardner).

131. No evidence was admitted as to whether the judgment issued in Canada would prevent future infringement in the United States.

132. It is possible that switching gears could be disruptive to customers, some of whom have different kits (such as water and snow landing kits) for attachment to the Original Gear. See 10/22/14 AM Tr. at 40:4–5, 40:11–41:5 (Gardner).

133. Bell's witness, Mr. Gardner, testified that to his knowledge, Bell has no intention of switching to the sled gear for the Bell 429. Oct. 22 AM Tr. at 41:6–8 (Gardner).

134. As discussed supra at FF. 21 and FF. 88, Mr. Gardner was not a wholly credible witness.

135. Absent an injunction, Bell has an incentive to resume using the infringing gear, as a switch to the Original Gear would achieve a weight savings of 10 to 20 pounds, and may cost less to manufacture. See Gardner Dep. Tr. at 226:16–227:13 ("In March of 2005, we had a meeting to try and reduce the weight of the 429. Various elements to it, in terms of where we can remove weight from the airframe. And one of those elements was the skid gear that was under review."); Oct. 22 AM Tr. at 104:13–14 (Gardner) (estimating weight savings at 10–20 pounds); Lambert Dep. Tr. at 44:20–45:8 (estimated savings at 20

pounds); DX–330 at ¶ 30 ("BHTC's reintroduction of saddles and ski extensions [in the Modified Gear] negates any . . . cost benefit, in addition to the decrease in payload due to the extra weight); but see Oct. 21 AM Tr. at 61:13–25 (Logan) (estimating weight savings at 5 to 10 pounds).

136. Saving these pounds would potentially increase the range of the aircraft and its payload capability, two factors that affect the competitiveness of the aircraft. See Oct. 22 PM Tr. at 9:3–15 (Evans).

137. Weight is a very important factor because when you reduce the weight of the aircraft, you can put more people in it and transport more weight; Bell has had meetings to try to reduce the weight of the Bell 429. Minderhoud Dep. Tr. at 131:9–20 ("Weight is the most important factor in all aircraft. When you reduce the weight of the aircraft, you can put more people in it and more weight that you transport."); Gardner Dep. Tr. at 226:16–227:13; Oct. 20 PM Tr. at 42–43 (Youngs).

138. The weight of the Bell 429 is constraining its sales in the United States, as the Bell 429 cannot currently carry a full load of fuel with 8 occupants in the United States. Oct. 22 AM Tr. at 102:23–103:20 (Gardner) (agreeing with statement in DX–343 that "the Bell 429 . . . is not capable of carrying a full load of fuel with 8 occupants" at the current weight for which it is certified); DX–343 at 3. Reducing the weight of the Bell 429 such that it could carry a full load of fuel with 8 occupants, while still complying with regulatory weight restrictions, would likely increase sales. Oct. 22 AM Tr. at 99:11–22, 103:14–104:2 (Gardner).

139. When Bell changed from the Original Gear to the Modified Gear in 2008 to 2009 it took approximately six months for Bell to have a flyable version of the Modified Gear; that included conceiving the

design, drafting layouts of the changed construction, and receiving engineering authorization to change the configuration of the production Bell 429. Oct. 22 AM Tr. at 34:13–19, 81:2–7 (Gardner).

140. Although the cost of developing and certifying a new helicopter landing gear typically is substantial, Oct. 22 AM Tr. at 6:16–18 (Kerr), it would likely not be so for the Original Gear.

141. Bell has already developed the Original Gear. *See supra* at FF. 10–21.

142. It would be very simple for Bell to certify the Original Gear for use with the Bell 429 if it wanted to do so because Bell already has drop test data on the Original Gear, that drop test data was used to calibrate Bell's analytical techniques which were used to get a finding of equivalency between the Original Gear and Modified Gear, and now Bell has operational experience with the Modified Gear which it has shown to be equivalent to the Original Gear. Oct. 21 AM Tr. at 62:5–19 (Logan).

## III. CONCLUSIONS OF LAW

### A. *Infringement*

■ A court may issue an injunction only upon a determination of infringement. *See Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1365 (Fed.Cir.1998); *Eli Lilly & Co. v. Medtronic, Inc.*, 915 F.2d 670, 674 (Fed.Cir.1990)). A party infringes a patent if it "without authority makes, uses, offers to sell, or sells any patented invention" in the United States, or imports a patented invention into the United States, during the patent's term. 35 U.S.C. § 271(a).

Airbus contends that Bell infringed the '621 patent by manufacturing the infringing Original Gear through its subsidiary, using the Original Gear for testing and demonstration, and offering to sell Bell 429s equipped with the Original Gear.

For the reasons that follow, the Court largely agrees. Bell infringed the patent when it employed the Original Gear during drop tests in Fort Worth, Texas, when it flew the Bell 429 with the Original Gear at the Heli–Expo in Houston, and when it offered to sell Bell 429s equipped with the Original Gear between 2005 and 2008. As for manufacture, however, Airbus has not demonstrated that the production of the Original Gear by Bell's subsidiary should be attributed to Bell itself.

#### 1. Manufacture

■ Airbus showed that the Original Gear was manufactured by Aeronautical Accessories Inc., which at the time was a wholly owned subsidiary of Bell. *See* FF. 30. Without more, however, this showing is insufficient to establish infringement by Bell.

■ A parent company is liable as a direct infringer under 35 U.S.C. § 271(a) for infringement by a subsidiary "only if the evidence reveals circumstances justifying disregard of the status of [the subsidiary and the parent] as distinct, separate corporations." *A. Stucki Co. v. Worthington Inds., Inc.*, 849 F.2d 593, 596 (Fed.Cir. 1988); *see also Tegal Corp. v. Tokyo Electron Co., Ltd.*, 248 F.3d 1376, 1379 (Fed. Cir.2001). "Mere ownership of stock is not enough to pierce the corporate veil." *Stucki*, 849 F.2d at 598 (internal quotation marks omitted). Because Airbus offered no evidence at trial that these corporate forms should be disregarded, the Court does not find that Bell infringed the '621 patent when Aeronautical Accessories manufactured the infringing Original Gear.

#### 2. Use

■ Bell employed the Original Gear in drop tests in its Mechanical Systems Test Laboratory in Fort Worth, Texas. *See* FF. 31. Bell suggests that the use of the

gear for drop tests is not a "use" under § 271, on the ground that "[a] drop test of landing gear does not place the landing gear into service for its beneficial purpose." Bell's Responses to Airbus's Proposed Findings of Fact ¶ 93 (Dkt. No. 204–3). Bell's apparent theory is that because the primary purpose of the gear is to land a helicopter, its employ for some other purpose—such as testing—cannot be a "use" under the statute.

■ Bell misconstrues the term "use," which refers more broadly to any act that "'put[s] [the invention] into action or service.'" *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed.Cir.2005) (quoting *Webster's Third New Int'l Dictionary* 2523 (1993)); *see also Bauer & Cie v. O'Donnell*, 229 U.S. 1, 10–11, 33 S.Ct. 616, 57 L.Ed. 1041 (1913) ("The right to use is a comprehensive term and embraces within its meaning the right to put into service any given invention."). A party may engage in a prohibited "use" of an invention even if it employs the invention for something other than its primary purpose. Indeed, the Federal Circuit "has established that testing is a use of the invention that may infringe under § 271(a)." *Waymark Corp. v. Porta Sys. Corp.*, 245 F.3d 1364, 1366 (Fed.Cir.2001) (citing *Roche Prods. v. Bolar Pharm. Co.*, 733 F.2d 858, 863 (Fed. Cir.1984), *superseded-in-part on other grounds by* 35 U.S.C. § 271(e)). Bell's testing of the Original Gear qualifies as an unauthorized use under § 271.

In addition, there is no dispute that Bell flew and landed a Bell 429 with the infringing Original Gear at the 2008 Heli-Expo in Houston, Texas. *See* FF. 35–39; Airbus's Proposed Findings of Fact ¶¶ 51–55; Bell's Responses ¶¶ 51–55. This action plainly falls within the scope of an unauthorized "use" under § 271, and therefore constitutes a separate act of infringement.

### 3. Offers to sell

■ Prior to its adoption of the Modified Gear, Bell entered into approximately 330 letters of intent with customers in the United States for the sale of Bell 429 helicopters. *See* FF. 40–42. Although the letters made clear that the equipment used on each aircraft could change prior to delivery, the Original Gear was the only landing gear used on the Bell 429 at the time these letters were signed. Customers therefore would have understood that, absent a manufacturing change, the helicopter offered would employ the Original Gear.

After Bell's first flight, which appears to have taken place in February 2007, the deposits accompanying signed letters of intent became nonrefundable; these agreements were considered to be firm orders. *See* FF. 43–44. Letters of intent solicited after February 2007 therefore constitute "offers to sell" by Bell under § 271. *See Rotec Industries, Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1257 (Fed.Cir.2000) (finding an offer where the seller "communicated a 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it'") (quoting RESTATEMENT (SECOND) OF CONTRACTS § 24 (1979)). And while it is a close call, it appears that letters signed *prior* to February 2007 also would constitute unauthorized offers under the statute, for the following reasons.[8]

In *3D Systems, Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373 (Fed.Cir.1998), the Federal Circuit identified the main pur-

---

**8.** Because Airbus has established infringement through unauthorized use and through the post-February 2007 letters of intent, this question matters only in determining the *extent* of infringement—not whether infringement occurred.

pose of the "offer to sell" provision to be "prevent[ing] ... [a competitor from] generating interest in a potential infringing product to the commercial detriment of the rightful patentee." *Id.* at 1379; *accord Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1309 (Fed.Cir.2010). Consistent with this purpose, the court in *3D Systems* held that the price quotes in that case—which described the infringing merchandise with specificity and provided a price at which it could be purchased—were "offers for sale" under § 271, even though the quotes were not classic offers under traditional contract law. 160 F.3d at 1379.

The Federal Circuit has more recently relied on a narrower, contracts law concept of "offer." *See, e.g., Rotec*, 215 F.3d at 1257; *Moldflow Corp. v. Simcon, Inc.*, 296 F.Supp.2d 34, 42 (D.Mass.2003) (questioning whether *3D Systems* remained good law in light of *Rotec* ). Nevertheless, the Federal Circuit has declined to overrule *3D Systems, see, e.g., MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1376 (Fed.Cir.2005) (citing with approval both *3d Systems* and *Rotec* ), which suggests that a broader definition may be appropriate in some circumstances, as some commenters have urged. *See* 4 Moy's Walker on Patents § 14:45 (4th ed. 2013) ("The better view is that infringement does not require a formal offer in the sense of contract law[.]"); Lucas S. Osborn, *The Leaky Common Law: An "Offer to Sell" As A Policy Tool in Patent Law and Beyond,* 53 SANTA CLARA L. REV. 143, 199 (2013) (observing that the

policy of preventing the commercialization of an infringing product is fundamentally different from the key policies underlying the contract law offer concept).

It appears to this Court that the facts here present precisely the sort of scenario that justifies a broader "offer" concept. There is no doubt that these letters were highly detailed and "generat[ed] interest in a potential infringing product to the commercial detriment of the rightful patentee." *3D Sys.*, 160 F.3d at 1379. Moreover, the strict contract law concept does not apply neatly to complicated business transactions such as this one, where trigger clauses transform an agreement from a non-binding understanding into an enforceable contract. *See* E. Allan Farnsworth, *Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations,* 87 COLUM. L. REV. 217, 222 (1987) (observing that "the classic sequence of offer and acceptance is often absent in important contract negotiations"). Under these circumstances, the letters of intent solicited between 2005 and 2007 should be viewed as unauthorized offers to sell.[9]

### B. The eBay Four–Factor Test

 Although injunctions are common in patent infringement cases, *see Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1314 (Fed.Cir.2012); *Presidio Components, Inc. v. Am. Tech. Ceramics. Corp.*, 702 F.3d 1351, 1362 (Fed.Cir. 2012), a patent holder that has proved infringement is not automatically entitled to a permanent injunction. The patentee must also demonstrate "(1) that it has

9. Airbus in its opening brief does not submit any arguments as to how Bell sold 429s equipped with the infringing Original Gear, but rather contends that Bell made offers for sale. However, in its response to Bell's proposed findings of fact, Airbus "submits that Bell *sold* and offered for sale numerous 429s that were equipped with the infringing Origi-

nal Gear." Airbus's Responses ¶ 31 (Dkt. No. 205–3). As all deliveries of Bell 429s to customers have included the noninfringing Modified Gear, and as Airbus has not provided arguments supporting a theory of sale, the Court finds that Airbus has not established that Bell undertook any unauthorized sales of Bell 429s.

suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC,* 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). Upon consideration of these factors and the evidence presented by the parties, the Court concludes that Airbus has met its burden under *eBay.*

### 1. Irreparable Harm

During the hearing, Airbus established that Bell's infringement caused Airbus to suffer irreparable harm in the form of lost sales, lost customers, and reputational harm. Airbus demonstrated that it spent considerable time and energy in developing its patented landing gear, and that Bell's copying of that design enabled Bell to expedite its marketing and certification processes for the Bell 429. As a direct competitor of Airbus, Bell obtained sales in the global and U.S. light twin markets that likely would have been captured by Airbus or related Airbus entities, contributing to a decline in sales of Airbus's EC–135 and EC–145, and possible long-term loss to Airbus's customer base. *See* FF. 45–60; *see Verizon Servs. Corp. v. Vonage Holdings Corp.,* 503 F.3d 1295, 1310 (Fed.Cir. 2007) (finding irreparable harm where infringement led not only to lost sales but also lost opportunities to sell related services to lost customers).

Airbus also presented evidence of a meaningful risk of lost sales in the future if Bell resumed its use of the Original Gear, as Bell likely would be able to attract customers away from Airbus if it reduced the weight of the Bell 429. A switch to the Original Gear would save up to 20 pounds, *see* FF. 135, which would likely boost Bell 429 sales, particularly if combined with other weight-savings measures. *See* FF. 136–138; *see* Minderhoud Dep. Tr. at 132:4–11 (admitting that "[e]ven half a pound" matters when trying to minimize helicopter weight). While Bell attempts to dismiss this theory as speculative, Airbus has provided ample evidence that the weight of the Bell 429 is currently constraining sales. *See* FF. 136–138. Furthermore, any boost to Bell's sales would harm Bell's competitors, particularly Airbus, which currently is the market leader in the light-twin market segment. *See Presidio,* 702 F.3d at 1363 ("Direct competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude.").

In addition, Airbus demonstrated that Bell's use of the Original Gear, accompanied by its claims of innovation in the American Helicopter Society article, likely gave the false impression among industry professionals that Bell had invented the sleigh gear. *See* FF. 79–90. Such actions likely led to reputational harm in two respects. Among those customers and industry members who mistakenly believed that Bell developed the sleigh gear, Bell obtained a boost (albeit a minor one) to its reputation at the expense of its competitor Airbus. Among those who correctly understood that the sleigh gear invention was Airbus's, Airbus may have been harmed by the perception that Airbus's innovations were readily adopted by its competitors. *See Douglas Dynamics, LLC v. Buyers Products Co.,* 717 F.3d 1336, 1344–45 (Fed. Cir.2013) (noting that exclusivity of innovations "is an intangible asset that is part of a company's reputation").

Finally, the fact that Airbus has refused to license the '621 patent further supports its assertion of irreparable harm.

The Federal Circuit has often recognized "the fundamental nature of patents as property rights granting the owner the right to exclude." *Presidio*, 702 F.3d at 1363 (quoting *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed.Cir. 2011)). Even where a royalty award may be calculated, a patentee may be irreparably harmed when forced to license its protected technology to a competitor. *Id.* (finding that "[patentee]'s unwillingness to license [the claimed invention] favored finding irreparable injury.").

Bell has raised several points in an attempt to undercut Airbus's assertions of harm. While certain of these arguments have some merit, they ultimately fall short of defeating Airbus's showing of irreparable harm.

First, Bell argues that Airbus failed to show that customers who purchased Bell 429s did so because they believed that they would receive the Original Gear. Bell argues that because the Original Gear did not motivate customers to choose the Bell 429, Airbus has failed to show a causal nexus between the infringement and the alleged harm. *See Apple Inc. v. Samsung Electronics Co.*, 695 F.3d 1370, 1374 (Fed. Cir.2012) ("[W]here the accused product includes many features of which only one (or a small minority) infringe ... the patentee must also establish that the harm is sufficiently related to the infringement."); *see also Presidio*, 702 F.3d at 1361 (holding that patentee must show "a reasonable probability that the sales would have been made 'but for' the infringement").

The Court agrees that Airbus has not shown that it lost sales to Bell because buyers were enticed by depictions of the Original Gear. *See* FF. 63–72. Thus, there is a lack of causal nexus between Airbus's lost sales and the infringing offers of sale for Bell 429s equipped with the Original Gear. The analysis is different,

however, with respect to Bell's use of the infringing gear for testing. Airbus has shown that because of this unauthorized use, Bell was able to market its Bell 429s earlier than it otherwise would have, and that this early entry directly contributed to a decline in Airbus's sales. *See* FF. 45–60. Furthermore, as noted above, Airbus has demonstrated that if Bell were to obtain a significant weight advantage with the Original Gear in the future, such infringement would likely lead to lost sales and lost customers by Airbus. *See* FF. 135–142.

▬ Bell next argues that much of the irreparable harm incurred will not occur again, regardless of whether an injunction is issued. "[I]njunctions are tools for prospective relief designed to alleviate future harm," *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed.Cir.2010), *aff'd,* —— U.S. ——, 131 S.Ct. 2238, 180 L.Ed.2d 131 (2011), and therefore cannot be entirely backwards-looking. *See Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1320 (Fed.Cir.2010) ("An injunction is only proper to prevent future infringement of a patent, not to remedy past infringement."). Some district courts accordingly have declined to issue permanent injunctions based solely on competitive harm resulting from the "head start" afforded by infringement. *See LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, 798 F.Supp.2d 541, 563 (D.Del. 2011) (finding that where the infringement enabled an infringer to "shape[ ] the market" several years before, such ongoing harm would continue even if an injunction were issued); *XpertUniverse, Inc. v. Cisco Sys., Inc.*, Civ. Action No. 09–157–RGA, 2013 WL 6118447, at *12 (D.Del. Nov. 20, 2013).

Bell's argument has some merit: if a past, unrecoverable loss in market share were the only harm demonstrated by Air-

274

bus, an injunction would be pointless. But as discussed above, Airbus also has demonstrated a non-speculative risk of future reputational harm, lost sales, and lost customers. Moreover, past harm remains a relevant consideration, *see i4i Ltd. P'ship*, 598 F.3d at 862 (courts must consider "whether the patentee *'has suffered* an irreparable injury' ") (emphasis in original) (quoting *eBay*, 547 U.S. at 391, 126 S.Ct. 1837), as it underscores Bell's ability to harm Airbus through infringement in the future.

■ Bell next turns to evidence that Bell will not re-adopt the landing gear, *see* FF 127–141, and argues that the Court should decline to issue an injunction where the infringer has voluntarily ceased its infringement. *See Respironics, Inc. v. Invacare Corp.*, Civil Action No. 04–0336, 2008 WL 111983, at *5 (W.D.Pa. Jan. 8, 2008) (declining to issue injunction where infringing device had not existed for four years prior to the court's ruling, and was "displayed for a short time at the trade show, was never offered for sale, and is not currently being made, offered for sale, or sold by [the infringing party]"); *see also Accentra Inc. v. Staples, Inc.*, 851 F.Supp.2d 1205, 1239 (C.D.Cal.2011), *aff'd in part, rev'd in part on other grounds*, 500 Fed.Appx. 922 (Fed.Cir.2013). But "[t]he fact that the defendant has stopped infringing is generally not a reason for denying an injunction against future infringement unless the evidence is very persuasive that further infringement will not take place." *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1281–82 (Fed.Cir.1988), *abrogated on other grounds by eBay Inc.*, 547 U.S. at 391–94, 126 S.Ct. 1837. The Court is not so persuaded here.

Although Bell's representative testified that Bell does not intend to use the Original Gear in the future, *see* FF. 133, the Court is not convinced that it can rely on this representation. Bell's witness on this point was not wholly credible. *See* FF. 21, 88, 134. Moreover, even if Bell voluntarily adopts a policy of using a different gear, Bell has in the past ignored its own policies with respect to intellectual property rights. *See* FF. 27.

Nor is the Court persuaded that Bell's switch to the Modified Gear demonstrates a commitment to respect Airbus's intellectual property rights. Bell's actions with respect to that landing gear were made in response to the Canadian litigation, *see* FF. 129–131, which may have limited deterrent power in the United States. And indeed, Bell's initiation of the present suit suggests that Bell is interested in using the Original Gear in the future.

Finally, Bell argues that Airbus's delay in filing this suit undermines its assertions of irreparable harm. The Federal Circuit has recognized that undue delay in bringing suit can "negat[e] the idea of irreparability." *Polymer Technologies, Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed.Cir.1996) (citation omitted). Although Bell began selling Bell 429s with the Modified Gear in 2009, Airbus did not bring suit against Bell until late 2010, and only then as a counterclaim to Bell's suit for declaratory judgment. This argument is undercut by the fact that Airbus began pursuing an intellectual property action with respect to the Canadian counterpart of the '621 patent in 2008, and in Europe in 2009. *See* FF. 123. The Court therefore finds no undue delay, and concludes that Airbus has shown past irreparable harm and a meaningful risk of reputational harm and lost sales if Bell were to infringe in the future.

2. Inadequacy of legal remedies

Legal remedies are inadequate to compensate for much of the harm incurred. In particular, the losses to Airbus's customer base and reputation "defy attempts

at valuation," and are unlikely to be remedied through a simple damages calculation. *See i4i Ltd. P'ship*, 598 F.3d at 862 ("Difficulty in estimating monetary damages is evidence that remedies at law are inadequate."); *see also Douglas Dynamics*, 717 F.3d at 1345 (finding that monetary remedies are often inadequate to remedy reputation loss).

### 3. Balance of hardships

The balance of hardships tips in favor Airbus, as Airbus has demonstrated the harm discussed above, and Bell has failed to show any hardship or inequity if an injunction issues. Although Bell could achieve competitive gains by using an infringing product, it has a noninfringing alternative ready to deliver to the market—indeed, that it already is delivering to the market. *See Douglas Dynamics*, 717 F.3d at 1345 ("If . . . [the infringer] had a noninfringing alternative which it could easily deliver to the market, then the balance of hardships would suggest that [the infringer] should halt infringement and pursue a lawful course of market conduct."). The injunction is narrowly tailored to the Original Gear; Bell will be able to continue to offer the Bell 429 with the Modified Gear.

### 4. Public interest

Finally, the public interest factor is neutral. Weighing in favor of an injunction is the public's interest in the enforcement of the right to exclude others from practicing a patentee's invention. *See Douglas Dynamics*, 717 F.3d at 1346 (recognizing "public's general interest in the judicial protection of property rights in inventive technology"). Cutting against this consideration is the fact that an injunction may lead to a loss of the sleigh gear in the light twin market for the next three years (the remaining time on the patent's term), as Airbus does not practice the invention on its EC–135 or EC–145. *See FF. 70.* This concern is mitigated, however, by the fact that Airbus could adopt the sleigh gear on these aircraft if customers demand it, and by the fact that the sleigh gear is available in another market segment. *See FF. 9.*

## IV. CONCLUSION

On balance, the *eBay* factors weigh in favor of Airbus. The Court therefore concludes that Airbus is entitled to a permanent injunction against Bell with respect to the '621 patent. An appropriate Order and Judgment accompanies this Opinion.